UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| SHAMYATTA MOORE, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 CV 50307 |
| | ) | Magistrate Judge Iain D. Johnston |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shamyatta Moore brings this action under 42 U.S.C. § 405(g), seeking reversal of the decision denying her social security benefits. Plaintiff argues that the administrative law judge misconstrued the testimony of the impartial medical expert who opined that she met Listing 7.05 based on her hemoglobin SC disease, a type of sickle cell disease. The matter is remanded.

**BACKGROUND**

The Court recognizes that some facts in the administrative record do not place plaintiff in a good light, to say the least. But an ALJ's determination of an applicant's eligibility for disability benefits cannot be based on the ALJ's view of the applicant's likeability.

Plaintiff filed her application in July 2010. She was then 25 years old, and had four children. Her youngest son was born in 2007 and was taken away from her because he had drugs in his system. R. 90. The pregnancy involved severe complications, requiring a 40-day hospital stay, part of it in the intensive care unit. Before and after the hospitalization, plaintiff visited the emergency room frequently reporting severe pain, sometimes in her legs and back, sometimes in

her abdomen and other places, all of which she attributed to her sickle cell disease.[1] In many (but not all) of these visits, doctors diagnosed her as having a sickle cell crisis, an acute painful episode caused by the disease. She typically was given IV fluids and pain medication and sent home without being hospitalized.

This appeal focuses on the medical expert's testimony. It will be helpful first to set out the legal tests, as they framed the ALJ's questioning of the expert. The listing is 7.00, entitled "Hematological Disorders."[2] It contains two parts relevant to this case. The first, section 7.00(c), is a type of gateway provision requiring the claimant to prove she has the disease:

> C. Sickle cell disease refers to a chronic hemolytic anemia associated with sickle cell hemoglobin, either homozygous or in combination with thalassemia or with another abnormal hemoglobin (such as C or F).
>
> Appropriate hematologic evidence for sickle cell disease, such as hemoglobin electrophoresis, must be included. Vaso-occlusive or aplastic episodes should be documented by description of severity, frequency, and duration.
>
> Major visceral episodes include meningitis, osteomyelitis, pulmonary infections or infarctions, cerebrovascular accidents, congestive heart failure, genito-urinary involvement, etc.

R. 15. Section 7.05 sets forth additional qualifications the claimant must show to be disabled:

> 7.05 Sickle cell disease, or one of its variants. With:
>
> A. Documented painful (thrombotic) crises occurring at least three times during the 5 months prior to adjudication; or
>
> B. Requiring extended hospitalization (beyond emergency care) at least three times during the 12 months prior to adjudication; or

---

[1] *See generally* http://www.hopkinschildrens. ord/sickle -cell-disease.aspx ("A genetic disease, most prevalent in the African-American community, sickle cell disease (also known as 'sickle cell anemia') is a disease in which red blood cells are an abnormal crescent shape. Red blood cells are normally shaped like a disc. They clump together, blocking blood vessels and creating intense pain.").

[2] This was the version in effect at the time of the decision. The agency has since revised the listing, making fairly extensive changes.

C. Chronic, severe anemia with persistence of hematocrit of 26 percent or less; or

D. Evaluate the resulting impairment under the criteria for the affected body system.

R. 16. Plaintiff is relying only on subsection (a).

There were two hearings before the administrative law judge ("ALJ"). At the first, on January 31, 2012, plaintiff's counsel announced at the outset that plaintiff was seeking to qualify under subsection (a) of Listing 7.05 and provided three dates in the past five months in which plaintiff had gone to the emergency room and doctors had diagnosed her as having a sickle cell crisis. R. 83. Plaintiff and a vocational expert then testified.

After this hearing, the ALJ concluded that expert testimony was needed, and called a second hearing, held on May 22, 2012. Dr. Ronald Semerdjian testified as the impartial medical expert.[3] His testimony is lengthy and can be broken down into three phases. In the first phase, Dr. Semerdjian gave his opinion on whether plaintiff met Listing 7.05(a). He explained first that plaintiff did not have sickle cell disease where the trait is inherited from both sides (referred to as sickle cell SS) but instead had hemoglobin SC disease where sickle cell trait is inherited from one parent (the "S") and a separate unspecified blood disorder is also inherited (the "C). He stated that hemoglobin SC disease typically produces less severe symptoms than sickle cell SS R. 42-43. He noted that "ordinarily" there should be "some documentation" of the disease in the record, but explained that "I think she's had it for as long as the record we have, plus we have the original testing done[.]" R. 43. He then explained that in reviewing the records of the "very frequent emergency room visits," he tried to "separate out what are visits for other things from

---

[3] There was a preliminary issue raised about the fact that 200 pages of recent medical records had only been put in the agency's disability folder the day before the hearing and that Dr. Semerdjian "was not able to complete his review of the medical documents in time for [the] hearing." R. 33. The ALJ expressed concern that Dr. Semerdjian would not "be able to provide meaningful information." R. 35. Despite this concern, the ALJ decided to go forward.

visits that are for [a sickle cell] crisis." *Id.* For example, he pointed to one visit where plaintiff complained about chest pain, which he stated "may or may not be related to [a sickle cell] crisis," but he did not count this visit as constituting one because the emergency room doctors did not designate it as such. R. 44. Even after excluding these visits, Dr. Semerdjian concluded plaintiff met Listing 7.05(a) because she had at least three crises in the last five months. R. 44.

In the second phase, the ALJ asked more pointed questions, ones that plaintiff complains were leading, focusing on specific parts of 7.00(c) and 7.05. Dr. Semerdjian testified that during these emergency room visits, plaintiff was given "supportive treatment" consisting of IV fluids and pain medication (Dilaudid). R. 45. The ALJ asked whether any other treatment is typically given, and Dr. Semerdjian said no, unless there were specific complications, one being aseptic necrosis where the reduced blood supply causes the bone to break down. He stated that there were two studies in the record that plaintiff had aseptic necrosis in her shoulder.

The ALJ asked Dr. Semerdjian to explain phrases in 7.00(c), such as "chronic hemolytic anemia," "homozygous," and "hemoglobin electrophoresis." The latter is a blood test used to diagnose sickle cell disease. Dr. Semerdjian noted that he could not find any evidence in the record that this test was performed, but noted that he assumed it had been done earlier because "[t]his is obviously something you're born with."[4] R. 48. The ALJ asserted that plaintiff would need some documentation to meet the listing. Dr. Semerdjian stated that a test could be done by having blood drawn. The ALJ then asked whether it would be expensive. The doctor was not sure, and the ALJ did not pursue this issue further.

---

[4] *See* http://www.nhlbi.nih.gov/health/health-topics/topics/sca/diagnosis ("Every state in the United States, the District of Columbia, and the U.S. territories require that every baby is tested for [sickle cell disease, which includes hemoglobin SC disease] as part of a newborn screening program.")

- 4 -

The ALJ then asked again about the emergency room visits. Dr. Semerdjian again noted that it looked like "what the emergency room was doing was looking at her record and seeing that she has a history of sickle cell SC disease," and "[s]o each time she appears, they attribute it to sickle cell crises and treat it as such." R. 48-49. However, he also stated that she had blood drawn "numerous times" and blood smears revealed "schistocytes," abnormal blood cells that, although not conclusive, would be "consistent with [hemoglobin SC disease] for sure." R. 49. The ALJ then noted: "In other words, we can confirm that there is a blood disorder." *Id.*

The ALJ next asked about "vaso-occlusive or aplastic episodes," a phrase from 7.00(c). Dr. Semerdjian explained that these refer to things like clots in the veins and noted that during the 2007 episode, plaintiff had some clotting but that it may have been due to a catheter being "left in for some time." R. 50. He also noted that there was evidence in May 2007 that she had some encephalopathy. He noted that during her extended hospitalization in 2007, she was diagnosed with HELLP (standing for hemolysis (H), elevated liver enzymes (EL), and low platelets (LP)), which is a syndrome in pregnant women that no one knows why it occurs. Both the ALJ and Dr. Semerdjian agreed that plaintiff "was a very ill person" at this time. R. 52.

The ALJ next asked questions about "major visceral episodes," another phrase from 7.00(c). Dr. Semerdjian stated that it did not appear that plaintiff had any of these episodes, although he noted that the 2007 hospitalization would be a "cerebrovascular accident." R. 52-53. Plaintiff's counsel then asked whether a lab report showed kidney failure. After a lengthy back and forth, it was agreed that the lab report did not indicate kidney failure. R. 52-59. The ALJ asked again about cerebrovascular accidents. Dr. Semerdjian noted that there was an MRI on June 15, 2007 that was "consistent with hemosiderin from prior micro-hemorrhaging from the SC disease." R. 61. In other words, she had a mild atrophy of the brain. *Id.* The ALJ tried to

characterize this answer to mean that plaintiff had no cerebrovascular accidents. R. 62. But Dr. Semerdjian again referred to the brain problems in 2007, although he stated that it was not clear it was due to SC disease or the HELLP syndrome. The ALJ asked the doctor to confirm that there were no pulmonary infections and the doctor answered no, but then stated that she had abnormal chest x-rays in May 2007. R. 63.

The ALJ then announced that he was going to ask about the "very specific" requirements of 7.05. He first asked about subsection (a) ("painful (thrombotic) crisis") and asked whether she had any thrombotic crisis. Dr. Semerdjian answered that he did not recall finding any recurrent episodes of thrombosis. The ALJ then asked about the Doppler tests. Dr. Semerdjian noted that there were several negative tests, one in December 2011 that was a venous Doppler finding that there was no DVT (deep vein thrombosis). The ALJ then asked about the other subsections in 7.05, and the doctor indicated that plaintiff would not meet those. The ALJ then attempted to get the doctor to sum up. Here is the relevant testimony:[5]

> Q. [B]ased on the medical information you reviewed, it seems like it doesn't necessarily meet Listing 7.05.
>
> A. Well, she would not actually meet it because of the absence of the [] electrophoresis and the laboratory studies [INAUDIBLE]. She has smears that would be consistent with it, but it would not meet the listing [INAUDIBLE] –
>
> Q. Okay. Then we're going to look to see whether or not she equals it. And if you equal it [INAUDIBLE] – based on a reasonable degree of medical certainty, do you have an opinion about [INAUDIBLE]?
>
> A. [INAUDIBLE]. I think she would equal it the last several months that we spoke of. And going back and trying to extend that to one year is more difficult, because as I go back, many of these admissions that I've listed in my notes are really [INAUDIBLE]. And they're emergency room visits but they're listed as abdominal pain and she's in for abdominal pain.
>
> Q. Well, could the abdominal pain be a symptom of sickle cell?

---

[5] Unfortunately, the transcript has many INAUDIBLE segments.

> A. It could be, but [] they don't designate it as such. So I don't know what their perspective was. And usually, I've tried to limit it where they actually said "sickle cell crisis." They said that her crisis typically is pain in the lower back, pain in the lower extremity. That's typically the way she has presented this [INAUDIBLE] – but this is her typical presentation of her crisis. The abdominal pain is not so clear, because as they said, they've gone ahead and done additional studies, looking to see if there are other causes for this. And I think – typically, the gall bladder, but they've not – it doesn't look to me as if they come to any conclusions. Some of the abdominal pain may have been sickle cell crises, but I can't say for sure.
>
> Q. Okay. Now you mentioned that you thought in the last several months you could probably indicate that she equals 7.05. What date are you thinking?
>
> A. Well, I think it should be going back to November of 2011. They actually have specifically said, "This is a sickle cell crisis," and it's usually been the typical event that she presents for it – pain in the lower extremities, lower back, and lower extremities. [T]he ER visits were very frequent. And it's a little bit [] unusual that FC **[n.b.** likely "SC" disease] – but there are different degrees of penetration of the genes [phonetic].
>
> Q. Okay. Well, as far as whether or not these are crises, based on a reasonable degree of medical certainty, can I say these are crises?
>
> A. I think we have to assume they are, because at least these emergency room visits – it is identifying them as such. And they are similar in terms of their presentation. And this is what they have accepted as her sickle cell crisis.

R. 65-67. The upshot of this second phase is that Dr. Semerdjian perhaps modified his opinion slightly by stating that, although plaintiff may not have strictly met the documentation requirements of Section 7.00(c), she nonetheless equaled the requirements of 7.05(a). In its response brief, the government states that Dr. Semerdjian "amended" his opinion during the course of the hearing, presumably referring to this second phase. (Gov. Resp. Br. at 6.)

In the third phase, plaintiff's counsel took over questioning and basically had Dr. Semerdjian reaffirm his bottom-line conclusion:

> Q. Doctor, you would agree that at least according to the records, that there are three sickle cell crises in the five months noted prior to today's adjudication, correct?

A. Yes.

Q. And that's all that Listing 7.05A requires, correct? 7- the C—the C has to do with the diagnosis, correct? []

A. Oh, yes.

Q. Yeah.

A. That's correct.

Q. And you don't disagree that my client's been properly diagnosed as having sickle cell anemia, correct?

A. No. I've said that – well, not sickle cell anemia, but sickle cell – SC –

Q. Disease. Right.

A. – sickle cell anemia – it's – usually when you – when we say "sickle cell anemia," really should mean the SS. And she has SC.

R. 75-76.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence or making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary

support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, *33-34 (N.D. Ill. 2013).

The only issue before this Court is whether plaintiff meets the listing for sickle cell disease. Plaintiff does not challenge other findings, such as the residual functional capacity analysis. Set forth below is the pertinent part of the opinion analyzing the listing issue:

> Although the plaintiff contends that she meets the requirements of [the listing], the medical expert at [the] hearing carefully explained that she does not satisfy the precise requirements and only "equaled" the requirements if he *liberally* construed the working diagnoses of emergency room doctors as documenting sickle cell crises. That is, they responded to asserted symptoms of sickle cell pain with intravenous Dilaudid administration, but they did not undertake diagnostic testing or provide clinical findings. The claimant did not require transfusion or hospitalization.
>
> By contrast, the medical expert construed the claimant's time-limited May 2007 to June 2007 crises as meeting this definition. Therein, she was hospitalized for six weeks with spontaneous ruptured membranes, complicated by HELLP syndrome, diffuse encephalopathy and prolonged intubation. Then, abnormal foci hemorrhages appeared on imaging, with mentation deterioration. Nevertheless, her treatment course since has not risen to this level.
>
> He distinguished emergency room visits from emergency room crises. He observed that the claimant has the less aggressive form of sickle cell disease and that the record lacks diagnosis documentation of the type enumerated below.
>
> <u>7.00 HEMATOLOGICAL DISORDERS</u>
>     <u>Section</u>

C. *Sickle cell disease* refers to a chronic hemolytic anemia associated with sickle cell hemoglobin, either homozygous or in combination with thalassemia or with another abnormal hemoglobin (such as C or F).

Appropriate hematologic evidence for sickle cell disease, such as hemoglobin electrophoresis, must be included. Vaso-occlusive or aplastic episodes should be documented by description of severity, frequency, and duration.

Major visceral episodes include meningitis, osteomyelitis, pulmonary infections or infarctions, cerebrovascular accidents, congestive heart failure, genito-urinary involvement, etc.

***7.05 Sickle cell disease or one of its variants.*** With:
A. Documented painful (thrombotic) crises occurring at least three times during the 5 months prior to adjudication; or

B. Requiring extended hospitalization (beyond emergency care) at least three times during the 12 months prior to adjudication; or

C. Chronic, severe anemia with persistence of hematocrit of 26 percent or less; or

D. Evaluate the resulting impairment under the criteria for the affected body system.

The medical expert anecdotally discerned that the claimant's emergency room visits were more like outpatient primary care support than acute episodes. There were many *short-lived* visits involving lower back and lower extremity pain, rather than abdominal pain, and very few *ongoing* urinary tract infections, which departed from the known disease pattern. The record did not contain extended stay or extended treatment references. It appeared to him that the attending physicians simply accepted pain on these *discrete* occasions as the presenting symptom, but made no substantial clinical findings.

To put this in perspective, during one such January 2012 episode, she would not leave the emergency room until she received a Dilaudid injection, but the attending observed that she was *walking around the examination room drinking soda and eating Doritos in no apparent distress.*

The medical expert perceived that there was a diffuse etiology of symptoms that were not characteristic of sickle cell anemia, and that drug-seeking was a possibility, which coincided with a past history of opiate dependence. She appears to visit multiple sources to obtain narcotic medications.

R. 15-16 (emphasis added by the ALJ) (exhibits citations removed).

After reviewing this explanation, the Court concludes that this case should be remanded. The ALJ's reasoning is vague in several respects, but more importantly it relies on an aggressive—and, at times, skewed—interpretation of the expert's testimony. To put it more bluntly, the ALJ essentially rejected the medical expert's opinion despite making it look like he and the expert were in agreement.

The above explanation consists of a number of loosely tethered and interlocking observations, followed by back-to-back block quotes of the legal tests, followed by yet more observations. However, the ALJ did not match up the observations to the discrete parts of the tests. The ALJ lumped the two sections together, making it hard for this Court to know exactly what he found was lacking.

It thus makes sense to consider the two sections separately, beginning with the gateway provision in 7.00(c). As this Court reads this section, it contains really only one mandatory provision. The claimant must provide "appropriate hematologic evidence" that she has sickle cell disease. [6] The section lists, as one example of such evidence, the hemoglobin electrophoresis test. As noted above, Dr. Semerdjian was not able to determine whether this test had been conducted. This raises an initial question: did the ALJ conclude that plaintiff failed to satisfy 7.00(c)? The short answer: we are not sure. The ALJ never explicitly stated that he did not believe plaintiff had hemoglobin SC disease, nor did he clearly find that plaintiff's claim should be rejected for lack of documentation. At the same time, he made statements suggesting that he

---

[6] As Dr. Semerdjian testified, plaintiff has hemoglobin SC disease, not sickle cell SS. Although the ALJ mentioned this fact in the opinion, neither the ALJ nor Dr. Semerdjian stated that that this type of sickle cell disease (assuming other qualifications are met) could not meet the listing. Section 7.00(c) specifically refers to sickle cell hemoglobin in combination with "another abnormal hemoglobin (such as C or F)." Similarly, Listing 7.05 refers to sickle cell disease "or one of its variants."

had doubts about these questions. He noted that Dr. Semerdjian observed (i) that plaintiff lacks the "diagnostic documentation of the type" referred to in 7.00(c), (ii) that plaintiff had a "diffuse etiology of symptoms that were not characteristic of sickle cell," and (iii) that "drug-seeking was a possibility" because the visits "coincided with a past history of opiate dependence."

To the extent that the ALJ found plaintiff failed to satisfy 7.00(c)—and this Court is not sure if he did—then the ALJ should have provided a more complete analysis. The ALJ gives the impression that Dr. Semerdjian had doubts whether plaintiff had hemoglobin SC disease. But this is a misimpression, at best. At the start of his testimony, Dr. Semerdjian testified that it was his opinion that plaintiff met listing 7.05, which would necessarily require that she have some form of the disease. Even when he later testified that plaintiff may not have met the precise requirements of Section 7.00(c), he nonetheless concluded that plaintiff would *equal* the listing. This again would have to rest on the belief that she had the disease. Thus, his professional judgment clearly was that plaintiff had SC disease.

As for whether the specific documentation requirement of 7.00(c) had been met, even this point is not clear to this Court. It is true, as the doctor testified, that no one found evidence that the electrophoresis test had been done. But as noted above, section 7.00(c) simply refers to "appropriate hematologic" evidence. Neither the ALJ, nor the parties here, have discussed the possibility that there is evidence meeting this standard. Dr. Semerdjian referred to various lab reports that pointed to hemoglobin SC disease. He noted that plaintiff had aseptic necrosis in her shoulder, that she had schistocytes in blood smears, and that an MRI showed hemorrhaging

attributable to SC disease.[7] The ALJ agreed during the hearing that this evidence shows "there is a blood disorder" of some sort, although he did not acknowledge this fact in his opinion, nor seek to identify what the actual disorder was. Plaintiff was also diagnosed numerous times by hospital doctors as having a sickle cell crisis. As Dr. Semerdjian speculated, these doctors may have seen the confirmatory evidence that plaintiff had the disease. *See* R. 644 (note from Dr. Bakshi: "I did not see that it was necessary to redraw [blood] again with the documentation that she is positive for sickle cell."). It would seem surprising if none of these doctors ever checked whether plaintiff, in fact, had the disease.

If the ALJ believed the above evidence did not qualify as "appropriate" evidence, then the ALJ should have considered getting a definitive blood test. The current version of Listing 7.00 states: "We will make every reasonable effort to obtain the results of appropriate laboratory testing you have had. We will not purchase complex, costly, or invasive tests, such as tests of clotting-factor proteins, and bone marrow aspirations." § 7.00(B)(4). It is not known whether a confirmatory test here would be costly or difficult. The fact a confirmatory test is given to all newborns would suggest it is not. The ALJ should explore this issue further.

The Court next considers Section 7.05. Here again, the ALJ did not explicitly connect the evidence to the legal test. The ALJ mostly discussed observations made by Dr. Semerdjian. However, Dr. Semerdjian stated three times that plaintiff met the requirements of 7.05(a), either

---

[7] In this Court's review of the record, it noted additional statements in the record that may provide further support that plaintiff has hemoglobin SC disease. *See* R. 728 (summary of lab report: "On admission, hemoglobin was 8.8, hematocrit 25.9, white blood cell count 8, platelets 234, sickle cell 1, Howell-Jolly bodies present, *hemoglobin SC crystals present*, Pap bodies present."); R. 544 (findings from imaging: "There is mild sclerosis of the visualized osseous structures which would be consistent with the patient's known sickle cell disease."); R. 540 (imaging report: "The spleen is marked[ly] diminutive in size which may be due to sequela of autoamputation in this patient with sickle cell disease."); R. 656 ("Complicated urinary tract infection with complicating factors of hemoglobin S-C disease."). These may not be probative for some reason, but the ALJ on remand should at least consider them.

directly or by equaling the listing. *See* R. 44 ("In this period of time that I mentioned, she would meet a listing because she would have at least three visits for crises in the five months preceding adjudication."); R. 65 ("I think she would equal [7.05] the last several months that we spoke of."); R. 75 ("Q: Doctor, you would agree that at least according to the records, that there are three sickle cell crises in the five months noted prior to today's adjudication, correct? A: Yes.").

The ALJ essentially ignored these statements by aggressively spinning the doctor's testimony to make it look like he did not really believe his own opinion. For example, the ALJ stated that the doctor's opinion was reached only after he "liberally" construed the "working" diagnoses of emergency room doctors. But these qualifications do not undermine the doctor's opinion. For one thing, this Court cannot find any statement in the hearing transcript where the doctor ever stated, at least in a direct way, that his opinion was based on a liberal reading of the evidence. Even if he made such a statement, it would not necessarily mean he was disavowing his own opinion. The decision on how to interpret the record—whether liberally or some other way—is part and parcel of the doctor's medical judgment, absent clear evidence showing that the doctor varied from accepted practice. As for the "working" diagnoses, the ALJ does not explain why a "working" diagnosis would be insufficient. It is not as if there is a later diagnosis undermining them. In any event, Dr. Semerdjian did not use this moniker.

The ALJ gave the impression that Dr. Semerdjian doubted these diagnoses. The ALJ cited to statements by Dr. Semerdjian such as the one that emergency room doctors "dealt with" plaintiff's pain "as if" they were sickle cell crises. But in making these statements, Dr. Semerdjian did not state that the doctors' conclusions were unwarranted. Again, if he had doubted their diagnoses, he would not have concluded that plaintiff met the requirements of 7.05(a). The ALJ also complained about the failure of these doctors to make "substantial clinical

findings." But the ALJ did not explain what further steps or tests would normally be conducted. Dr. Semerdjian did not identify any. And the record does not suggest that these doctors jumped to a diagnosis of sickle cell disease without considering other possibilities. *See, e.g.,* R. 943 ("Multiple diagnoses were considered in evaluation of this patient. At this time her presentation is most consistent with: Sickle cell pain crisis."). In some of the visits, the doctors concluded that she was not having sickle cell crisis, showing that it was not a default diagnosis applied in every case. Dr. Semerdjian, in his analysis, excluded such visits, even though he stated that it was still possible that they too could have been related to plaintiff's hemoglobin SC disease.

The ALJ insinuated that plaintiff was engaged in drug-seeking behavior rather than having a sickle cell crisis. Although Dr. Semerdjian stated (after prompting from the ALJ) that "there's always a concern about drug-seeking" because of plaintiff's earlier cocaine habit, he then stated that all the drug screens since 2007 had been negative for cocaine. R. 69-70. None of the emergency room doctors (insofar as this Court can tell) pointed to drug seeking as an explanation.[8]

The other major concern this Court has with the ALJ's analysis is that he essentially imposed additional requirements not included in 7.05. For example, the ALJ complained that plaintiff was not hospitalized after going to the emergency room. However, subsection (a) merely requires three "crises." In contrast, subsection (b), which plaintiff was not relying on,

---

[8] The closest the ALJ came to pointing to specific evidence of drug-seeking behavior is a doctor's statement in a January 2012 report that plaintiff was seen "*walking around the examination room drinking soda and eating Doritos in no apparent distress*" (italics were added by the ALJ) and wanted a Dilaudid injection before leaving. R. 16. But the ALJ has ignored a key contextual fact. Although plaintiff was eating Doritos (would a salad made of kale – which is a good garnish but not ready to anchor a meal – have made it okay?), this was only *after* she had received an earlier injection of Dilaudid, and the doctor who made this observation still "discharged [her] with a diagnosis of sickle cell pain crisis." *Id.*

explicitly refers to hospitalizations "beyond emergency care." By implication, subsection (a) cannot be read to require a hospitalization as these subsections are alternative ways of meeting the listing. Similarly, the ALJ emphasized that plaintiff's sickle cell crises were "short-lived" and "discrete." But it is not clear to this Court that this would preclude a finding that they were nonetheless still sickle cell crises. The same point applies about the lack of transfusions and the fact that urinary tract infections were not "ongoing" or frequent. Neither the ALJ, nor the government, has pointed to medical authority suggesting that transfusions or urinary tract infections are necessary for a sickle cell crisis to be diagnosed. At the hearing, the ALJ asked Dr. Semerdjian whether the treatment plaintiff received—intravenous Dilaudid and fluids—was customary, and he stated it was.

In sum, the Court finds that the ALJ failed to provide a sufficient explanation for his decision and improperly rejected the opinions of the medical expert and emergency room doctors based on his own assessment of the evidence. In doing so, he improperly played doctor. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (the ALJ should "rely on expert opinions instead of determining the significance of particular medical findings themselves"); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted; the government's motion is denied; and this case is remanded for further consideration.

Date: July 2, 2015      By: _____
                                                       Iain D. Johnston
                                                       United States Magistrate Judge